UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-18-2020

ROY LANCE WARE,

                    Plaintiff,

    - against -

L-3 VERTEX AEROSPACE, LLC et al.,

                    Defendants.

16 Civ. 8067 (LAP)

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Plaintiff Roy Lance Ware ("Ware") brings this case against

his former employers, Vertex Aerospace, LLC, L-3 Communications

Integrated Systems, LP, and L-3 Communications Holdings, Inc.

(together, "L-3" or "Defendants")[1] under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 1981 ("Title VII"), the New York

State Human Rights Law ("NYSHRL"), and the New York City Human

Rights Law ("NYCHRL").  Ware claims that L-3 discriminated

against him on the basis of race, retaliated against him for

complaining about discrimination, subjected him to a hostile

work environment, and rejected applications he submitted for

multiple positions at L-3 for improper reasons.  Defendants now

move for summary judgment under Federal Rule of Civil Procedure

_____

[1]    Although Defendants aver that they are separate corporate
entities, Ware contends that they all employed him. (Defendants'
Rule 56.1 Statement, dated May 10, 2019 ("Def. 56.1 St.") [dkt.
no. 117] ¶ 2; Plaintiff's Rule 56.1 Counter-Statement, dated
July 9, 2019 ("Pl. 56.1 St.") [dkt. no. 136] ¶ 2.)

1

56.  (Notice of Defendants' Motion for Summary Judgment, dated May 10, 2019 [dkt. no. 116].)  For the reasons explained below, Defendants' motion is GRANTED.

## I.  Background

During the timeframe at issue, L-3 provided aircraft maintenance and repair services for the U.S. government in Afghanistan.  (Def. 56.1 St. ¶¶ 3-4.)  Until September 2013, Ware, an African-American man, was a supply technician in Shindand, Afghanistan for a defense contracting firm that shared a storage warehouse with L-3.  (Id. ¶¶ 12-13.)  When L-3's distribution manager for the Shindand site announced retirement plans, L-3 hired Ware to fill the open position.  (Id. ¶¶ 14-26.)  In November 2013, Ware completed orientation training in Mississippi and reported to Afghanistan to begin working as a distribution manager for L-3.  (Id. ¶¶ 29, 37.)

**Discriminatory Treatment.**  Ware submitted a declaration walking through various instances of discrimination he claims to have faced while working for L-3, including the following:

- At orientation, L-3 employees including Todd Jardee -- one of the L-3 supervisors involved in hiring Ware -- "were cold and distant" to Ware, which Ware attributed to the fact that he was African American.  (Declaration of Roy Lance Ware, dated July 8, 2019 ("Ware Decl.") [dkt. no. 134] ¶¶ 16-19.)

- Jardee required Ware to stay at orientation longer than white trainees in order to watch a hazmat video, even though Ware was already certified in hazmat. (Id. ¶¶ 23-38.) Ware notes that he was the only supervisor at orientation; the other trainees who left early were mechanics. (Id. ¶ 9; Def. 56.1 St. ¶ 31.)

- Felicia Taylor, an African-American woman who served as Jardee's administrative assistant, advised Ware not to request additional time off before departing for Afghanistan, which Ware interpreted to mean that as an African American, he would not be permitted the same leave time afforded to white employees. (Ware Decl. ¶¶ 45-49.)

- When a shipment failed to arrive at the L-3 warehouse, an L-3 manager accused Ware of stealing the shipment. (Id. ¶¶ 76-82.) Ware believed he would not have been so accused had he not been a minority. (Id. ¶ 81.)

- When Ware requested to take time off, managers including Jardee hassled him before letting him go. (Id. ¶¶ 83-90.) Ware does not believe that white employees faced the same push back he received. (Id. ¶ 86.)

- Giving virtually no specifics, Ware notes that he observed or heard about L-3 treating minority employees unfairly, plotting to "get rid of" them, disciplining them when white employees got off scot-free for similar conduct, and retaliating against them for complaining of discrimination. (Id. ¶¶ 104-05, 108-09, 149, 113-15.)

- When Ware tried to defend Jason Allen, another African-American employee, after Allen was reprimanded, a white supervisor told Ware that Allen was the one who "was prejudiced" because he "doesn't like white men to boss him around." (Id. ¶¶ 106-12.)[2]

---

[2]    Ware also submitted a declaration from Allen in which Allen recounted, among other things, feeling that managers were dismissive to him but friendly to white employees, that managers "seemed prejudiced," that L-3's decision to keep Ware at

*footnote continued on next page . . .*

**Retaliatory Treatment.** Ware's declaration also describes instances where he and other minority employees complained about discriminatory treatment at L-3, including the following:

- When Ware complained to one supervisor that minority employees felt discriminated against, the supervisor became "angry and resentful." (Id. ¶¶ 117-22.) The supervisor ultimately convened a meeting to let employees air their grievances, but he ran the meeting in an aggressive manner that discouraged minority employees from speaking freely. (Id. ¶¶ 123-28.) After the meeting, Ware told a group of supervisors that the minority employees were afraid to speak up, and one white manager said that the employees were "cowards" and "problem kids." (Id. ¶¶ 129-32.)

- Ware described unspecified examples of discriminatory conduct to Jon Scoggins, who Ware believed was an "EEOC guy" investigating discrimination. (Id. ¶¶ 133-46.) Scoggins did not include Ware's and other L-3 employees' complaints of discrimination in the report he prepared at the close of the investigation and told Ware the minority employees were the "problem" and a "bunch of babies." (Id. ¶ 141.) After the investigation, Jardee treated Ware "worse than ever," which Ware attributes, on information and belief, to Jardee's being angry that Ware had reported discrimination. (Id. ¶ 145.) L-3 contends that the investigation involved allegations that an L-3 manager verbally abused and threatened employees, not allegations of discrimination, and that there is no evidence that any employees, including Ware, reported discrimination in the course of the investigation. (Def. 56.1 St. ¶¶ 51-70.)

- After hearing a report that Jardee was plotting to fire him, Ware called Jardee and said he was being treated unfairly for discriminatory reasons and that he was forced to justify managerial decisions that went unquestioned when made by white managers. (Ware Decl. ¶¶ 151-53.) Ware also told Jardee that other employees felt that they were

. . . *footnote continued from previous page*

orientation longer than others seemed "to be a result of racism," and that one employee told Allen he had heard L-3 supervisors using "the N-word about African-American employees." (Declaration of Jason Allen, dated July 3, 2019 ("Allen Decl.") [dkt. no. 135].)

targets of discrimination, and Jardee replied that Ware was being "too easy" on minority employees. (Id. ¶¶ 155-56.) Jardee disputes that Ware complained of discrimination during the phone call in question. (Def. 56.1 St. ¶ 124.)

**Credit Card Misuse and End of Ware's Employment.** In December 2014, Ware left Afghanistan on vacation to the United States. (Id. ¶¶ 84-91.) In the course of tracking down how Ware booked his flight home, Felicia Taylor pulled Ware's corporate credit card records and noticed a charge for $815.35 at a jewelry store. (Id. ¶¶ 93-101.) L-3's written corporate credit card policy prohibits employees from using the company card for personal expenditures and states that misuse can result in various forms of disciplinary action. (Id. ¶ 104.) In his declaration, Ware avers that despite L-3's policy, employees "were repeatedly told that [they] could use [their] credit card for personal items as long as [they] paid off the balance within 60 days." (Ware Decl. ¶ 173.)

Jardee learned about the credit card misuse and informed Abel Vela, an employee in L-3's human resources department. Vela told Jardee that HR would look into it, and Jardee e-mailed Ware informing him that the credit card issue was under investigation. (Def. 56.1 St. ¶ 105-09.) A few days later, Vela e-mailed Jardee advising that HR decided to cancel Ware's credit card privileges and suspend him for 3 days. (Id. ¶ 111.)

Following the e-mail from Vela, Jardee spoke to Ware over the phone. (Id. ¶ 113.) Jardee testified at his deposition that he informed Ware of the forthcoming suspension and, in response, Ware told Jardee that he felt discriminated against and was resigning. (Id. ¶ 114.) Ware disputes Jardee's account of the call, claiming that he never resigned and that Jardee told Ware he had not been permitted to leave Afghanistan when he did and that Ware would face repercussions. (Ware Decl. ¶¶ 174-79.) After the call, Jardee sent Ware an e-mail confirming Ware's resignation from L-3; Ware replied stating that he would be seeking legal counsel. (Def. 56.1 St. ¶ 118.) Ware testified that he did not know exactly how his employment ended but he believed he had been terminated for discriminatory and retaliatory reasons. (Id. ¶ 121; Ware Decl. ¶¶ 181-84.)

**Applications for Other Positions at L-3.** A few months after his employment ended, Ware applied for dozens of other jobs at L-3, ranging from janitor to intelligence support specialist. (Def. 56.1 St. ¶¶ 131-76) Nobody at L-3 asked Jardee about Ware with respect to any of those job applications. (Id. ¶ 133.) L-3 used a job application tracking system that gave its recruiters no access to race or ethnicity information about an applicant when reviewing his application. (Id. ¶ 134.) Many of the positions to which Ware applied were cancelled or filled before L-3's recruiters had completed reviewing Ware's

application.  (Id. ¶¶ 136, 139.)  Defendants rejected Ware's
applications for the remaining jobs because Ware did not have
the basic qualifications, including having certain licenses and
security clearances.  (Id. ¶¶ 140-76.)  Ware avers that some of
those qualifications were not needed to perform the jobs in
question and that he had relevant experience for each role.
(Ware Decl. ¶¶ 186-200.)

## II.  **Legal Standard**

Federal Rule of Civil Procedure 56(a) provides that a
"court shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  "The movant
bears the burden of demonstrating the absence of a genuine
dispute of fact, . . . and, to award summary judgment, the court
must be able to find after drawing all reasonable inferences in
favor of a non-movant that no reasonable trier of fact could
find in favor of that party."  Palmer/Kane LLC v. Rosen Book
Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016) (citation
and internal quotation marks omitted).  When the nonmovant bears
the burden of proof on an issue, "the moving party may simply
point out the absence of evidence to support the nonmoving
party's case."  Nora Beverage, Inc. v. Perrier Grp. Of Am.,
Inc., 164 F.3d 736, 742 (2d Cir. 1998) (citing Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986)).

When ruling on a motion for summary judgment, the Court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). The plaintiff cannot avoid summary judgment simply by relying on "conclusory statements, conjecture or speculation," Gross v. Nat'l Broad. Co., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002), and must instead offer "concrete particulars." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination . . . would necessitate a trial in all Title VII cases.").

Courts "must be cautious in granting summary judgment in employment discrimination cases because 'the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication.'" White v. Pacifica Found., 973 F. Supp. 2d 363, 372-73 (S.D.N.Y. 2013) (quoting Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997)). Notwithstanding the need for caution, it is well settled that "summary judgment may be appropriate even in the fact-intensive context of discrimination cases" and that "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to other areas of litigation."

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (citation and internal quotation marks omitted). To withstand summary judgment, an employment discrimination plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts"—he "must come forth with evidence sufficient to allow a reasonable jury to find his favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (citation and internal quotation marks omitted).

## III. Discussion

Ware asserts claims under Title VII, the NYSHRL, and the NYCHRL for unlawful discrimination, retaliation, hostile work environment, and failure to hire.[3] The Court grants Defendants' motion for summary judgment on all claims.

### a. Defendants Are Entitled to Summary Judgment on Ware's Discrimination Claims

#### i. Title VII and NYSHRL

Courts in this Circuit analyze race discrimination claims under federal and New York State law using a three-step burden shifting framework. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). At the first step, the plaintiff bears the burden of establishing a prima facie case of discrimination by

---

[3]     Ware initially brought a claim under the False Claims Act but has since withdrawn it. (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated July 9, 2019 ("Opp.") [dkt. no. 133] at 1 n.1.)

showing that (1) he belongs to a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of race discrimination. See id. If the plaintiff makes a prima facie showing, the burden shifts to the employer to show a legitimate, non-discriminatory reason for the adverse action. Assue v. UPS, Inc., No. 16 Civ. 7629 (CS), 2018 WL 3849843, at *11 (S.D.N.Y. Aug. 13, 2018). Finally, if the employer provides a legitimate, nondiscriminatory reason, the burden returns to the plaintiff to show that the proffered reason "was not its true reason but rather a pretext for unlawful discrimination." Id.

### 1. Prima Facie Case

Ware has not shown that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination. An adverse employment action is a "'materially adverse change' in the terms and conditions of employment." Galabya v. New York City Bd. Of Educ., 202 F.3d 636, 640 (2d Cir. 2000). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Terry v.

Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (alteration omitted) (quoting Galabaya, 202 F.3d at 640).

Ware contends that he suffered an adverse action by having his employment terminated.[4] (Opp. at 4-5.) The evidence shows, however, that Ware was not terminated and instead resigned. E-mails reflect that after Ware's credit card misuse came to light, Jardee conferred within the company about the disciplinary response, and an HR director advised him that "[w]e need to suspend [Ware] for 3-days without pay" and that Ware had lost his credit card privileges. (Def. 56.1 St. ¶¶ 108, 111.) Jardee testified that he then spoke to Ware over the phone informing him of the forthcoming disciplinary actions and that Ware told Jardee that he "quit." (Id. ¶¶ 113-14.) Taylor testified that she walked into Jardee's office right after the call ended, and Jardee told her that Plaintiff quit. (Id. ¶ 115.) Jardee then sent Ware an e-mail stating "Per our recent telephone conversation on December 22 we accept your resignation of employment effective immediately." (Id. ¶ 118.) In his response, Ware did not question the statement about resigning and instead stated, "Yes you will here [sic] from my lawyer soon Todd for your discrimination and unethical treatment towards

[4]     Ware also argues that the hostile work environment he endured constitutes an adverse employment action. (Opp. at 4 n.3.) The Court addresses the hostile work environment claim in a separate section of this order. (See, infra, Section III.c.)

11

me." (Id.) Additional evidence corroborates that Ware resigned on the December 22 call. (See id. ¶¶ 116-17, 19.)

Although Ware testified and submitted a declaration stating that he did not quit (see, e.g., Pl. 56.1 St. ¶¶ 114, 121, 200), nothing else in the record supports his position, and his statements alone are insufficient to create a genuine fact issue given the weight of the countervailing evidence. See Deebs v. Alstom Transp., Inc., 346 Fed. App'x 654, 656 (2d Cir. 2009) (affirming summary judgment against plaintiffs when they relied "almost exclusively on their own deposition testimony" and "made no attempt . . . to square their own speculative, and subjective, testimony with the hard evidence"). The Court therefore concludes that Ware did not suffer an adverse employment action on the basis of his purported termination.

Nor has Ware adduced sufficient evidence for rational jurors to find that discriminatory intent drove Defendants' actions. "No one particular type of proof is required to show that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." Ellis v. Century 21 Dep't Stores, 975 F. Supp. 2d 244, 271 (E.D.N.Y. Sept. 28, 2013) (quoting Ofoedu v. St. Francis Hosp. & Med. Ctr., No. 04 Civ. 1707, 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006)) (brackets omitted). The standard is a "flexible one that can be satisfied differently in differing factual

12

scenarios." Howard v. MTA Metro-N. Commuter R.R., 866 F. Supp.

2d 196, 204 (S.D.N.Y. Nov. 7, 2011) (quoting Chertkova v. Conn.

Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996)).

Ware argues that Defendants treated him worse than his

white counterparts (Opp. at 7), but the evidence he cites

consists almost exclusively of statements in his declaration

that are vague and conclusory,[5] speculative, and based on

"information and belief"[6] or inadmissible hearsay,[7] none of which

---

[5]    See, e.g., Ware Decl. ¶ 14 ("it is now obvious to me that
L-3 does not like African-American employees to have leadership
positions"); ¶¶ 17-19 (stating that L-3 managers were "cold and
distant" to Ware and "that the coldness was because [he] was
African-American"); ¶ 104 ("Supervisors regularly and blatantly
plotted 'to get rid of' minority employees, screamed and yelled
at them, and disciplined them for actions which they did not
discipline Caucasian employees for."); ¶ 105 ("I regularly
witnessed minority employees being written up for bogus
allegations, and witnessed them being retaliated against after
they complained about discrimination."); see also Allen Decl.
¶ 5 (L-3 managers "were extremely dismissive of me, but friendly
to my Caucasian counterparts"); ¶ 9 (L-3 managers' conduct
"appeared to me to be the result of racism").

[6]    See, e.g., Ware Decl. ¶ 6 ("I believe that, due to my skin
color, I would not have been hired for the role if L-3 had not
been in such a desperate situation to fill the role."); ¶ 44
("Upon information and belief, I would not have been required to
do Hazmat training even though I was already certified in
Hazmat, or to stay longer at all, if I were not African-
American."); ¶ 86 ("Upon information and belief, Caucasian
employees were not given a hard time about taking their
leave."); ¶ 114 ("Upon information and belief, [other] L-3
minority employees . . . suffered similar adverse treatment,
including being written up for bogus infractions, threatened
with termination and baselessly demoted or transferred.").

[7]    See, e.g., Ware Decl. ¶ 97 ("Supervisor Clark soon called
me back and reported that . . . none of the white employees had

*footnote continued on next page . . .*

is sufficient to survive a summary judgment motion. See Whitley
v. Montefiore Med. Grp., No. 13 Civ. 4126 (LTS), 2016 WL
1267788, at *8 (S.D.N.Y. Mar. 30, 2016) ("conclusory deposition
testimony in which [plaintiff] makes generalized complaints of
bias" was not enough to withstand summary judgment); Goenaga v.
March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.
1995) (summary judgment motion will not be denied merely "on the
basis of conjecture or surmise") (citation omitted); Patterson
v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004)
(inadmissible hearsay assertions in affidavits are "insufficient
to create a genuine issue for trial"). Taken as a whole, Ware's
evidence of discriminatory intent is far too thin to create a
genuine issue of material fact necessitating a trial.

## 2. Legitimate, Non-Discriminatory Reason for Purported Adverse Employment Action

Even if Ware had established a prima facie case, Defendants
provided a legitimate, non-discriminatory reason for suspending
him: Ware charged an $800 personal expenditure at a jewelry
store to his corporate credit card, which L-3's written

---

. . . *footnote continued from previous page*

been docked for their leave time but that all four of the
African-American employees had been docked"); ¶ 115 (one
employee "reported that he was treated hostilely and looked down
upon because he was friends with, and attended church with, an
African-American man"); Allen Decl. ¶ 15 ("Eduardo Guerrera
reported that he often heard Defendants' supervisors use the N-
word about African-American employees.").

corporate credit card policy clearly prohibits. (Def. 56.1 St. ¶¶ 101-04, 106.) The burden therefore shifts back to Ware to show that Defendants' proffered explanation is simply a pretext for discrimination. Assue v. UPS, Inc., No. 16 Civ. 7629 (CS), 2018 WL 3849843, at *11 (S.D.N.Y. Aug. 13, 2018). The Court concludes that Ware has not adduced sufficient evidence on this point to withstand summary judgment.

In making his pretext arguments, Ware does not dispute the $800 charge or that L-3's written card policy prohibits using company cards for personal purchases. (See Pl. 56.1 St. ¶ 101, 104.) Instead, citing only his declaration, Ware contends that he was "repeatedly" told by unspecified persons on unspecified occasions that L-3 employees could use corporate cards for personal purchases as long as they paid the balance within 60 days. (Pl. 56.1 St. ¶ 102; Ware Decl. ¶ 173.) But Ware gives no further evidentiary support for this claim, and the Court finds that his uncorroborated declaration does not create a fact question on whether his credit card use violated company policy. See Plotzker v. Kips Bay Endoscopy Ctr., LLC, 12 Civ. 9255 (GBD), 2017 WL 4326061, at *7 (S.D.N.Y. Sept. 8, 2017) (granting summary judgment when plaintiff's allegations were "premised solely on his own contentions, contradicted and unsupported by direct or circumstantial evidence").

Ware's other arguments are equally unavailing. For example, he contends that pretext is suggested by L-3 representatives' purportedly conflicting testimony on how they discovered the credit card misuse, with Felicia Taylor testifying that she became aware of it through L-3's Shared Services department and Jardee testifying that he was notified by L-3's travel department. (Opp. 9-10.) To whatever extent there are inconsistencies in the record on this point, they are not material and nowhere near the level that might lead a reasonable juror to question Defendants' proffered reason for disciplining Ware. See Williams v. Regus Mgmt. Grp., LLC, 836 F. Supp. 2d 159, 174-75 (S.D.N.Y. 2011) ("[T]o raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, a plaintiff must produce not simply some evidence, but enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination." (emphasis in original)).

ii. NYCHRL

"The New York City Human Rights Law was intended to be more protective than the state and federal counterpart." Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014) (quoting Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011)). Under the NYCHRL, "the plaintiff need only show differential treatment -- that [he] is treated less well --

16

because of a discriminatory intent." Mihalik v. Credit Agricole
Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013)
(citation and internal quotation marks omitted).  "[T]he
challenged conduct need not even be tangible (like hiring or
firing)."  Id. (citation and internal quotation marks omitted).

As the Court found with respect to Ware's Title VII and
NYSHRL claims, there is insufficient evidence for reasonable
jurors to conclude that Defendants acted with discriminatory
intent, even in the context of the broader protections afforded
by the NYCHRL.  The record reflects that Jardee may have been a
difficult person to work under, but nothing besides conclusory,
speculative, or inadmissible evidence supports a finding that he
or anyone else at L-3 treated Ware worse because of his race.
(See supra, section III.a.i.1.)  The Court therefore grants L-3
summary judgment on the NYCHRL claim.

### b. Defendants Are Entitled to Summary Judgment on the Retaliation Claims

#### i. Title VII and NYSHRL

Courts analyze retaliation claims under Title VII and the
NYSHRL using the same burden shifting framework applied to
discrimination claims.  See Westbrook v. City Univ. of N.Y., 591
F. Supp. 2d 207, 233 (E.D.N.Y. 2008).  At the prima facie stage,
the plaintiff must show that: (1) he engaged in a protected
activity; (2) the employer was aware of the protected activity;

(3) the plaintiff suffered an adverse employment action; and (4) a causal connection exists between the plaintiff's protected activity and the adverse action. Id. If the plaintiff meets its prima facie burden, the employer must then articulate a legitimate, non-retaliatory reason for the adverse action, and if it does, the burden shifts back to the plaintiff to show that the proffered reason was pretext for retaliation. D'Andrea v. Nielson, 765 Fed. Appx. 602, 605 (2d Cir. 2019) (citing Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013)).

Defendants are entitled to summary judgment on Ware's retaliation claims because no rational juror could find that he suffered an adverse employment action. The "adverse employment action" concept is broader in the context of retaliation than it is in the context of discrimination. Schultz v. Congregation Shearith Israel of City of N.Y., 867 F.3d 298, 309 (2d Cir. 2017). To constitute an adverse employment action in the retaliation context, "the employer's conduct must be harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. (quotations, alterations, and citation omitted).

Ware claims that Defendants took three adverse actions against him. (Opp. at 18.) First, he contends that after he first called Jardee complaining about discrimination, Jardee started investigating his expense reports to find a basis for

18

disciplining him. Ware seems to be referencing a September 30, 2014 e-mail Jardee sent expressing disappointment that Ware tried to claim expenses L-3 did not cover and telling Ware that Jardee would send a revised expense report. (See Declaration of Gabrielle Vinci, dated July 9, 2019 [dkt. no. 132], Ex. S.) This incident did not cause Ware any harm that might dissuade an employee from reporting discrimination. See Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011) ("Actions that 'are trivial harms' -- i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience' -- are not materially adverse." (citation and internal quotation marks omitted)).

Second, Ware contends that following additional complaints of discrimination, Jardee "instigated a campaign to find some basis to terminate Ware's contract prematurely." (Opp. at 18.) Here, Ware points to e-mails showing internal confusion and inquiries at L-3 regarding Ware's departure from Afghanistan in December 2014 and the eventual discovery of Ware's corporate credit card misuse. (See Pl. 56.1 St. ¶¶ 237-42; Vinci Decl. Exs. H, X-Z, BB-JJ.) These e-mails themselves do not reflect adverse actions, nor does Ware's planned suspension for credit card misuse, as Ware quit before the suspension took effect. See Chang v. City of N.Y. Dep't for the Aging, No. 11 Civ. 7062, 2012 WL 1188427, at *7 (S.D.N.Y. Apr. 10, 2012) (dismissing

retaliation claim when plaintiff "resigned before any suspension or other potential adverse action was imposed"), report and recommendation adopted, 2012 WL 2156800 (S.D.N.Y June 14, 2012).

Even if the proposed suspension did constitute an adverse employment action, Ware's claim would still fail because there is insufficient evidence that his discrimination complaints were causally linked to the suspension decision. The record shows that Felicia Taylor, who is also African American, uncovered the credit card misuse and had never heard any complaints from Ware. (Def 56.1 St. ¶¶ 98-105, 125-26.) Additionally, the directive to suspend Ware came from a Human Resources officer who also appears not to have been aware of any complaints from Ware. (Id. ¶¶ 106-12.) Under these circumstances, the fact that Jardee (who purportedly heard complaints from Ware) liaised with Taylor and HR on the credit card issue and informed Ware of HR's decision to suspend him is not enough to show causation.

Finally, Ware contends that the termination of his employment constituted an adverse action. But as the Court already held, the evidence establishes that Ware resigned and was not terminated. (See supra, section III.a.i.1.)

The incidents Ware cites, considered separately and in aggregate, could not lead a reasonable jury to conclude the L-3's conduct likely would have dissuaded employees from reporting racial discrimination. Moreover, even if Ware had established

20

an adverse employment action and the other prima facie elements
for retaliation, the Court would nevertheless grant summary
judgment because Ware has not raised a triable issue that the
credit card infraction was a pretext for retaliation.

ii. NYCHRL

To prove retaliation under the NYCHRL, the plaintiff must
show that: (1) he engaged in a protected activity; (2) his
employer was aware of the protected activity; (3) he "suffered
an action that would be reasonably likely to deter a person from
engaging in the protected activity;" and (4) there is a causal
link between the protected activity and the adverse action.
Whitley v. Montefiore Med. Grp., 2016 WL 1267788, at *10
(S.D.N.Y. Mar. 30, 2016) (quoting Roberts v. United Parcel
Serv., Inc., 2016 WL 4509994, at *21 (E.D.N.Y. July 27, 2015).

For the same reasons articulated above, the Court finds
that Ware did not suffer an action that would deter a reasonable
employee from reporting discrimination. As a result, the Court
grants summary judgment on the NYCHRL claim, as well.

### c. Defendants Are Entitled to Summary Judgment on the Hostile Work Environment Claims

i. Title VII and NYSHRL

To prove a hostile work environment claim under federal and
New York State law, the evidence must show that the plaintiff's
workplace was "permeated with discriminatory intimidation,

ridicule, and insult, that [was] sufficiently pervasive or severe to alter the conditions of [his] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57. 65 (1986)) (addressing Title VII); see also Bermudez v. City of N.Y., 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011) (addressing Title VII and NYSHRL). Even if the plaintiff can establish a hostile environment, he cannot prevail absent evidence that the hostility "was caused by [discriminatory] animus." Sullivan v. Newburgh Enlarged Sch. Dist., 281 F. Supp. 2d 689, 704 (S.D.N.Y. 2003). "An environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes." Id. (quoting Forts v. City of N.Y. Dep't of Corr., No. 00 Civ. 1716, 2003 WL 21279439, at *4 (S.D.N.Y. June 4, 2003).

In opposing summary judgment on the hostile work environment claim, Ware cites incidents of purported racism along with evidence that, among other things: he was required to stay at orientation longer than other employees; supervisors were rude to him, did not shake his hand, and tried to diminish his prior work experience; he was hassled about taking leave; he was baselessly accused of theft; and he was told that his managers were plotting against him. (Opp. at 14-15; Pl. 56.1 St. ¶¶ 28-32, 43-44, 121, 178, 219-36.) Taken together, the

incidents Ware recounts fail, as a matter of law, to establish that he was exposed to hostility so pervasive or severe that it altered the conditions of his employment. See, e.g., Thomas v. iStar Fin., Inc., 448 F. Supp. 2d 532, 534 (S.D.N.Y. 2006) (employee failed to establish hostile work environment when, among other things, his employer ignored his requests for more efficient procedures, accused him of wrongdoing when items went missing, and delayed his training).

The hostile work environment claim fails for the separate reason that Ware has not shown that any hostility he faced was racially motivated. For example, Ware contends that he was forced to stay at training longer because of his race, but the evidence supports no inference of racial animus and instead indicates that Ware had to stay longer because he was a supervisor while all the other trainees were mechanics. (Def. 56.1 St. ¶ 31; Ware Decl. ¶¶ 8-9.) Similarly, Ware contends that he was given a much harder time than white employees when requesting time off, but the sole basis for that claim is an "information and belief" allegation in Ware's declaration having no further support in the record. (See Opp. at 14; Ware Decl. ¶ 44.) Ware also alludes to the other instances of racism the Court already found overly conclusive, speculative, or based on inadmissible hearsay. (See Opp. at 14; supra section III.a.i.1.) The absence of evidence of racial animus compels

summary judgment. See Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015) ("It is axiomatic that the plaintiff must also show that the hostile conduct occurred because of a protected characteristic.") (citation omitted).[8]

### i. NYCHRL

Under the NYCHRL's standard for a hostile work environment claim, the "plaintiff must show that he or she was treated less well because of a protected status." Sandler v. Montefiore Health Sys., Inc., 16 Civ. 2258 (JPO), 2018 WL 4636835, at *11 (S.D.N.Y. Sept. 27, 2018) (quoting Forrester v. Corizon Health, Inc., 278 F. Supp. 3d 618, 626 (E.D.N.Y. 2017)). "In contrast to state and federal law, the NYCHRL imposes liability for harassing conduct even if that conduct does not qualify as severe or pervasive, and questions of severity and pervasiveness go only to the question of damages, not liability." Id.

---

[8]     Ware also appears to have asserted a claim for constructive discharge, (see, e.g., First Amended Complaint, dated Nov. 30, 2017 [dkt. no. 50] ¶¶ 21, 250-51), but he failed to oppose summary judgment on that claim, and the Court therefore dismisses it as abandoned. Gaston v. City of New York, 851 F. Supp. 2d 780, 796 (S.D.N.Y. 2012) (dismissing claims that plaintiff did not address in opposing summary judgment motion). Even if not deemed abandoned, the constructive discharge claim necessarily fails based on the court's dismissal of the hostile work environment claim, as the "constructive discharge standard is higher than that for hostile work environment." See Lambert v. Trump Int'l Hotel & Tower, 304 F. Supp. 3d 405, 427 (S.D.N.Y. 2018) (noting that "when an individual has failed to allege a hostile work environment, his constructive discharge claim based on those allegations must also fail") (citations and internal quotation marks omitted).

(citation and internal quotation marks omitted). The Court concludes that even under this more lenient standard, Defendants are entitled to summary judgment on Ware's NYCHRL hostile work environment claim because, as explained above, no reasonable juror could conclude from the record that Ware suffered differential treatment because of his race.

### d. Defendants Are Entitled to Summary Judgment on the Failure-to-Hire Claims

Ware alleges that from May 2015 to July 2016, he applied for multiple jobs at L-3 and was rejected or denied consideration for discriminatory and retaliatory reasons. The Court will address the claims based on discrimination and retaliation in turn.

#### i. Discriminatory Failure-to-Hire Claims

Ware's discriminatory failure-to-hire claims under Title VII and the NYSHRL require the same burden shifting analysis discussed above. Gaffney v. Dep't of Info. Tech. & Telecomms., 536 F. Supp. 2d 445, 462-63 (S.D.N.Y. 2008). At the prima facie stage, the plaintiff must show that (1) he is a member of a protected class; (2) he was qualified and applied for a position the defendants were seeking to fill; (3) defendants rejected his application; and (4) after plaintiff's rejection, the position remained open and the defendants continued fielding applicants with plaintiff's qualifications or offering the position to

someone not in plaintiff's protected class.  Id. at 462.  The key question is "whether circumstances could be reasonably read as supporting an inference of discrimination."  Id.

Ware has failed to make a prima facie case for his discriminatory failure-to-hire claims.  First, he does not dispute that L-3's job application tracking system gave recruiters no "access to age, gender, race and ethnicity information of an applicant when they reviewed the application." (Pl. 56.1 St. ¶ 134.)  Ware gives no other evidence indicating that in connection with his post-resignation applications, he submitted a photo or any other information revealing his race to recruiters.  (See Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, dated Aug. 13, 2019 [dkt. no. 141] at 11-12.)  The absence of evidence that L-3's recruiters knew Ware was African American is fatal to his claims.  See Gass v. Evergreen Aviation Ground Logistics Enter., Inc., 07 Civ. 402 (ENV) (RER), 2008 WL 11437035, at *4 (E.D.N.Y. Oct. 15, 2008)("It is axiomatic that there can be no disparate treatment if the decision maker was unaware of plaintiff's race at the time the adverse decision is made.").

Nor is there any evidence that Defendants continued seeking applicants with Ware's qualifications or filled the open posts with non-African-American candidates after rejecting Ware's applications.  (See Opp. at 22.)  That, too, is fatal to his

claims. See Ghosh v. N.Y.C. Dep't of Health, 413 F. Supp. 2d 322, 336-37 (S.D.N.Y. 2006) (granting summary judgment when plaintiff "offered no evidence about who, if anyone, was hired for the positions in question or whether [defendant] continued to solicit applications of similar candidates after [plaintiff] was rejected"). Because Ware failed to meet his prima facie burden, the Court grants Defendants' motion for summary judgment on the federal and state failure-to-hire claims.

For similar reasons, the Court also grants summary judgment on Ware's discriminatory failure-to-hire claim under the NYCHRL. To prevail under the NYCHL, the plaintiff must show that he was "treated less well at least in part because of a protected trait." Hughes v. Twenty-First Century Fox, Inc., 304 F. Supp. 3d. 429, 445 (S.D.N.Y. 2018) (quoting Jablonski v. Special Counsel, Inc., 16 Civ. 5243 (ALC), 2017 WL 4342120, at *5 (S.D.N.Y. Sept. 28, 2017)). There is insufficient evidence for reasonable jurors to conclude that race played any role in Defendants' rejecting Ware's applications or that Ware received worse treatment in the application process than non-African Americans did. The NYCHRL claim is therefore dismissed.

i.   Retaliatory Failure-to-
     Hire Claims

Defendants are also entitled to summary judgment on Ware's retaliatory failure-to-hire claims under Title VII, the NYSHRL,

and the NYCHRL. Prevailing on these claims requires establishing, among other things, a causal connection between plaintiff's discrimination complaints and the purportedly retaliatory acts. See Saji v. Nassau Univ. Med. Ctr., 724 F. App'x 11, 14 (2d Cir. 2018) (addressing Title VII and NYSHRL) (summary order); Mingguo Cho v. City of New York, No. 11 Civ. 1658 (PAC) (MHD), 2012 WL 4364492, at *6 (S.D.N.Y. Sept. 25, 2012) (addressing NYSHRL and NYCHRL). Here, there is no evidence causally linking Ware's discrimination complaints to his rejected job applications. Although Ware argues that at least Jardee knew of his complaints (Opp. at 23), he cites nothing in the record remotely suggesting that the employees who actually evaluated and rejected his applications were similarly aware. Without any evidence to that effect, there is no question of material fact regarding causation, and the retaliatory failure-to-hire claims must fail. See, e.g., Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 270-71 (S.D.N.Y. 2007) (granting summary judgment when plaintiff failed to offer evidence that the individuals who terminated his position knew of plaintiff's complaints).

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [dkt. no. 116] is GRANTED. The Clerk of the Court is directed to mark the action closed and deny all pending motions as moot.

Dated:    New York, New York
February 18, 2020

*Loretta A. Preska*

LORETTA A. PRESKA
Senior United States District Judge